UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| NANAL, INC., | Case No. 2:19-cv-02211-RFB-EJY |
| Plaintiff, | **ORDER** |
| v. | |
| SMK INTERNATIONAL, INC., et al, | |
| Defendants. | |

## I.      INTRODUCTION

Before the Court are Defendants' Motions for Partial Summary Judgment, ECF Nos. 75, 76, Plaintiff's Motion for Preliminary Injunction, ECF No. 81, and Plaintiff's Motion to Shorten Time on Setting a Hearing, ECF No. 87. For the reasons stated below, the motions are **DENIED**.

## II.      PROCEDURAL HISTORY

On December 23, 2019, Plaintiff filed a Complaint. ECF No. 1. On February 19, 2020, Plaintiff filed a First Amended Complaint, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, trademark infringement under 15 U.S.C. § 1114(1)(a), and unfair competition under 15 U.S.C. § 1225(a). ECF No. 10. On January 15, 2021, Defendants filed an emergency motion for a Temporary Restraining Order ("TRO"). ECF

37. Plaintiff replied and Defendants responded, ECF Nos. 40-44, 49. Defendants then filed a Motion for Preliminary Injunction ("PI"). ECF No. 50.

On February 2, 2021, the Court held a hearing on the motions for TRO and PI. ECF No. 51. The Court ordered that Defendants file a Motion to Amend their answer and counterclaim, and a new Motion for Preliminary Injunction by February 9, 2021, and for Plaintiff to file a response within two weeks thereafter. Id.

On February 9, 2021, Defendants filed a Motion to Amend, ECF No. 52, and a Motion for Preliminary Injunction, ECF Nos. 53-56. Defendants' Motion for Preliminary Injunction sought to enjoin Plaintiff from filing Intellectual Property Rights ("IPR") recordings with U.S. Customs and Border Protection. Defendants alleged that the filing of IPRs caused Customs to detain containers bearing trademarks owned by Plaintiff and licensed to Defendants. Plaintiff responded on February 23, 2021, ECF Nos. 50-51, and Defendants replied on March 2, 2021, ECF Nos. 63-64.

On March 5, 2021, the Court held an evidentiary hearing and granted the Motion to Amend. ECF No. 71. On April 19, 2021, the Court issued a written order denying Defendants' Motion for Preliminary Injunction. ECF No. 77. Discovery closed on March 4, 2021 and motions were ordered due by April 5, 2021. ECF No. 32.

On April 5, 2021, Defendants filed two motions for partial summary judgment on the subject of damages. ECF Nos. 75, 76. Plaintiff responded on April 26, 2021. ECF No. 78. Defendants replied on May 3, 2021. ECF Nos. 79, 80. On September 14, 2021, Plaintiff filed a Motion for Preliminary Injunction. ECF No. 81. Defendants responded on September 30, 2021. ECF No. 85. Plaintiff replied on October 14, 2021. ECF No. 86. Plaintiff filed a Motion to Shorten Time to Set a Hearing on the Preliminary Injunction motion on November 18, 2021. ECF No. 87. Defendant responded on December 2, 2021. ECF No. 89. On December 3, 2021, the Court ordered a hearing on Defendants' two Motions for Partial Summary Judgment, ECF Nos. 75, 76, and on Plaintiff's Motion for Preliminary Injunction, ECF No. 81

The Court took the parties' arguments under submission and this Order follows.

**III.    DEFENDANT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

    **a.  Factual Background**

        **I.  Undisputed Facts**

The Court finds the following facts to be undisputed based on its review of the record and the parties' briefing.

Plaintiff Nanal created a website called Leatherup.com, which sells leather clothing, helmets, and other gear designed for motorcycle riders. Plaintiff also created and owned various trademarks over motorcycle boots, helmets, and other gear sold on Leatherup.com and other websites. On May 1, 2019, Plaintiff Nanal ("seller") and Defendant SMK ("buyer") entered into an "Asset Purchase Agreement" (the "APA"). Defendant Mohammed Maqbool, the owner of SMK, was a guarantor of the APA. That same day, the parties entered into a License Agreement.

Under the terms of the APA and License Agreement, Defendant SMK was granted a terminable license to use Nanal's website, trademarks, and other intellectual property. See ECF No. 75-2, at Section 1.01. In exchange, Defendant agreed, *inter alia*, to pay Nanal a "purchase price" of $1,700,000, plus the assumption of "Assumed Liabilities." Id. at Section 1.03. These "Assumed Liabilities" include Nanal's debt of $150,000.00 to third party Shopify, Inc ("Shopify"). Id. at Section 1.02. SMK agreed to pay the cash portion of the "purchase price" in monthly installments. Id. at Disclosures, Ex. A, "Payment Allocation Schedule." SMK also agreed that part of the $1,700,000 purchase price would include the cancellation of a $1,000,000 debt that Nanal previously owed to SMK. Id. Section 5.09 of the APA further provides that SMK "shall sell the existing inventory of Seller's affiliate until such inventory is depleted," and that SMK would provide to Nanal "a credit card with a minimum limit of $100,000.00 for Seller to charge, daily, in respect of any such sales." Id. at Section 5.09. Section 5.09 further states that SMK "shall receive a royalty in the amount of 10% of gross sales revenue from the sale of Nanal's products." The APA itself does not define "Seller's affiliate."

The APA provides that Nanal may terminate the agreement by written notice, should SMK fail to perform or breach any of its material obligations under the APA, so long as Nanal is not

3

also in material breach of any provision of the APA. Id. at Section 8.01(c)(i). The License Agreement also provides that it automatically terminates if the APA is terminated.

On October 10, 2019, Nanal provided written notice to Defendants of the termination of the APA and License Agreement due to Defendants' alleged material breaches of both agreements. The notice requested that Defendants "immediately cease and desist" from using any of Nanal's Marks.

On February 19, 2020, Plaintiff filed a First Amended Complaint, alleging that Defendants breached the terms of the APA contract, as well as the implied covenant of good faith and fair dealing, by: (1) stopping payments on the SMK credit card that was provided to Plaintiff and ultimately freezing the credit card; (2) failing to fulfill two monthly purchase price payments pursuant to the terms of the APA, totaling $160,000; (3) selling inventory on the Leatherup.com website and failing to remit 90% of the proceeds to Nanal; (4) failing to pay Nanal for the value of remaining unsold inventory of "not less than $1,046,000"; (5) misappropriating merchandise that customers returned, and that should have been returned to Nanal's fulfillment center, Westshore Distributors ("Westshore"); and (6) failing to pay part of the Assumed Liabilities not less than $15,000. The First Amended Complaint also alleges that Defendants have violated the Lanham Act by: (1) engaging in the continued infringement of Nanal's intellectual property rights by continuing to make sales on Leatherup.com after Plaintiffs terminated the APA and License Agreement on October 10, 2019, including by continuing to sell products bearing the Nanal trademarks, and (2) engaging in unfair competition by marketing goods and services under the Nanal Marks with intent to deceive the public into thinking those goods and services are those of Nanal.

## II.  Disputed Facts

The parties dispute whether, under the terms of the APA, Defendants had the obligation to sell any of Nanal's inventory. They also dispute whether third-party distributor Westshore was Nanal's affiliate, whether Defendants *knew* that Westshore was Nanal's affiliate at the time of the APA execution, and whether Defendants therefore had an obligation to sell Westshore's inventory,

4

per Section 5.09 of the APA. Relatedly, the parties also dispute whether Westshore held upwards of $1,400,000 of Nanal's inventory that SMK was obligated to sell, pursuant to the APA; whether Plaintiff was harmed by SMK's alleged failure to sell the inventory of either Nanal or Westshore; and whether Nanal has adequately identified the types of damages it incurred for Defendants' alleged Lanham Act violations.

### b. Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

The Court applies a burden-shifting analysis to motions for summary judgment. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). When the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden either by presenting evidence to negate an essential element of the nonmoving party's case, or by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).

If the movant has carried its burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. Matsushita, 475 U.S. at 586. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the

1    nonmoving party, there is no 'genuine issue for trial.'" <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)

2    (quoting <u>Matsushita</u>, 475 U.S. at 586-87).

3            **c.  Analysis**

4            Defendants filed two motions for partial summary judgment. <u>See</u> ECF Nos. 75, 76. ECF

5    No. 75 argues that "Plaintiff has no damages for sales of Nanal's inventory," and that Plaintiff's

6    contract claims should accordingly be dismissed. ECF No. 76 argues that "Plaintiff has no Lanham

7    Act damages," and that Plaintiff's trademark infringement and unfair competition claims should

8    be dismissed. The Court addresses each motion in turn.

9            **i.  Defendants' Motion for Partial Summary Judgment "that Plaintiff**

10           **has no damages for sales of Nanal's inventory" (ECF No. 75)**

11           Defendants first argue that Plaintiff has provided no evidence of damages – caused by

12   either the sale of Plaintiff's inventory or by Defendants' failure to sell Plaintiff's inventory – that

13   would sustain Plaintiff's claims for breach of contract and breach of the implied covenant of good

14   faith and fair dealing. Plaintiff's Amended Complaint alleges that Nanal was damaged by SMK's

15   failure to sell "Nanal's Inventory" – however, Defendants contend, there is no genuine dispute of

16   fact that the APA did not require SMK to sell Nanal's inventory. Section 5.09 of the APA imparts

17   a duty upon SMK to sell "the existing inventory of Seller's *affiliate*" – it does not create a duty for

18   SMK to sell the existing inventory of Nanal itself. Thus, Defendants argue, there can be no breach

19   of contract for any failure to sell *Nanal's inventory*, as alleged in the Amended Complaint.

20   Defendants further argue it is undisputed that Nanal never had its own inventory. Defendants note

21   that Albert Bootesaz, Nanal's president and owner, admitted in his February 17, 2021 deposition

22   and at the March 5, 2021 preliminary injunction hearing that Nanal never had any inventory, and

23   has no remaining unsold inventory.

24           To the extent that the APA requires Defendants to sell "the existing inventory of Nanal's

25   affiliate," Defendants contend that it had no duty to sell Westshore's inventory, because Westshore

26   was never understood to be Nanal's affiliate. Defendants note that the Amended Complaint

27   conspicuously lacks any allegations that SMK failed to sell Westshore's inventory, and that there

28

is no evidence in the record that Westshore was Nanal's affiliate at the time the APA was executed. The APA does not define "Seller's affiliate" or "affiliate," and "affiliate" is ordinarily defined as an entity directly or indirectly controlled by another. Because Bootesaz admitted in depositions that he is not an owner of Westshore, has no personal knowledge of Westshore's inventory, and never had managerial authority over Westshore, Defendants contend that Westshore was not directly or indirectly controlled by Nanal, and thus could not be Nanal's affiliate. Defendants further argue that Plaintiff cannot prove that Defendants failed to pay the Assumed Liabilities under the terms of the APA, because the record contains evidence that Defendants paid the Shopify loan off through daily sales.

Plaintiff responds that there is a genuine dispute of material fact about the damages incurred by Nanal as a result of Defendants' failure to sell Plaintiff's inventory as required under the APA. Plaintiff contends that Defendants' argument that Plaintiff's contract claims fail because Plaintiff uses the phrase "Nanal's inventory" instead of "seller affiliate's inventory" in the Amended Complaint is a red herring. Plaintiff argues Defendants were well aware at the time the APA was executed that Westshore was the "seller's affiliate," is identified in Section 5.09 of the APA. Plaintiff adds that SMK needed additional personnel to process orders after acquiring Nanal's Leatherup.com business, so Nanal hired Westshore for this purpose, which SMK knew. Plaintiff argues that Defendants did not sell Nanal's inventory through its affiliate, Westshore, as required; for instance, Defendants purposefully changed the return address for returned purchases of remaining inventory, such that the merchandise was not returned to Westshore's address in Los Angeles, but instead, redirected to SMK' sister company in New Jersey, resulting in over $65,000 of losses to Nanal. Further, Plaintiff alleges that Defendants froze the SMK credit card such that Nanal could not reimburse itself for its 90% share of the sales on its existing inventory, in violation of Section 5.09 of the APA.

The Court finds that there are genuine disputes of material fact as to whether Westshore was Nanal's "affiliate" within the meaning of the APA, such that SMK's failure to sell Westshore's inventory constitutes a breach of Section 5.09 of the APA. Contract interpretation presents a mixed

7

question of law and fact. <u>State Farm Mut. Auto. Ins. Co. v. Fernandez</u>, 767 F.2d 1299, 1301 (9th Cir. 1985). The existence of any ambiguities in the contract must be determined as a matter of law, and if an ambiguity exists, a question of fact is presented. <u>Id.</u> (citations omitted). "Generally, 'language will be deemed ambiguous when it is reasonably susceptible to more than one interpretation.'" <u>Asarco, LLC v. Union Pac. R.R. Co.</u>, 765 F.3d 999, 1009 (9th Cir. 2014) (quoting Richard A. Lord, 11 <u>Williston on Contracts</u> § 32:2 (4th ed. 2014)).

Defendants contend that Westshore cannot be understood as an "affiliate" of Nanal's because Nanal never maintained any direct or indirect managerial control over Westshore. However, the Court finds that "affiliate" is reasonably susceptible to more than one interpretation in the context of the APA. In the corporate setting, "affiliate" may indeed mean "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, <u>Black's Law Dictionary</u> (11th ed. 2019). But "affiliate" may also more broadly mean "an affiliated person or organization," where "affiliated" is defined as a person or entity "joined or connected" to another. *Affiliate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/affiliate (last visited Dec. 15, 2021); *Affiliated*, <u>Ballentine's Law Dictionary</u> (3d ed. 1969). Importantly, the APA does not define the term "affiliate," nor does it specifically list Westshore as a "seller's affiliate," and both Plaintiff and Defendants argue that extrinsic evidence supports their understanding of the term. Because more than one reasonable construction of the term "affiliate" exists within the context of the APA as a whole, the Court finds that an ambiguity exists, sufficient to create a question of fact that must be resolved by a jury. <u>See</u> <u>Sony Computer Entm't Am., Inc. v. Am. Home Assurance Co.</u>, 532 F.3d 1007, 1013 (9th Cir. 2008) ("[A] provision is ambiguous only if it is susceptible to two or more reasonable constructions despite the plain meaning of the terms within the context of the [contract] as a whole."); <u>Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.</u>, 753 F.2d 1512, 1517-18 (9th Cir. 1985) (stating that the trier of fact "may consider extrinsic evidence to determine the intent of the parties" when "the operation of an ordinary contract is not clear from its language" (internal citation omitted)).

The Court further finds that a genuine dispute of material fact exists as to whether Defendants satisfied the Assumed Liabilities as required under the APA. Defendants argue they paid off the loan through daily sales, pointing to invoices in the record as evidence. Plaintiffs counter that at least $15,000 remained on the loan that was not paid off. The Court finds that the exhibits Defendants identify as evidence of the loan payments are far from definitive. They include an invoice, billed to SMK by Nanal, charging SMK $20,953.18 in connection with a "Shopify loan balance." But there is no additional exhibit in the record indicating that this invoice was, in fact, paid. Further, in its April 2021 Order denying Defendants' Motion for Preliminary Injunction, the Court observed based on the testimony and argument presented that "it is undisputed that Defendants failed to make payments consistent with [the] APA." A genuine dispute of material fact thus exists as to whether Plaintiffs were damaged by breach of Section 1.02 of the APA.

Accordingly, the Court finds that Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing survive Defendants' Motion for Partial Summary Judgment, ECF No. 75.

         i.    **Defendants' Motion for Partial Summary Judgment "that Plaintiff has no Lanham Act damages" (ECF No. 76)**

Defendants' second motion for partial summary judgment argues that Plaintiff's Lanham Act claims for trademark infringement and unfair competition should be dismissed for two reasons: (1) because Plaintiff has not articulated a precise amount of damages sought; and (2) because Plaintiff has failed to present evidence sufficient to establish damages under the Lanham Act "with reasonable certainty."

The Court rejects Defendants' first argument that summary judgment is appropriate because Plaintiff has failed to articulate a precise amount of damages incurred from Defendants' alleged Lanham Act violations. The Ninth Circuit has held that damages awarded under 15 U.S.C. § 1117 for violations of the Lanham Act at § 1125(a) and § 1114(1)(a) are subject to the "wide scope of discretion" of a district judge or jury. Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d

9

1105, 1113 (9th Cir. 2012). Defendants also argue that Plaintiff failed to disclose a consulting expert who analyzed Defendants' sales, but the Court finds this argument to be irrelevant to the issue of damages, as damages for Lanham Act violations may be awarded without expert testimony to establish a monetary award of actual damages, and "many sources can provide the requisite information upon which a reasonable jury may calculate damages." Id. In other words, the precise amount of damages to be awarded is a question for the jury to decide, and Plaintiff's failure to enumerate a specific amount of damages is not fatal to its claims at this stage.

The Court also rejects Defendants' second argument that Plaintiff has failed to provide sufficient evidence of damages or lost profits arising from Defendants' continued use of its intellectual property. Plaintiff's central argument is that Defendants infringed Nanal's trademarks and engaged in unfair competition when it materially breached the terms of the APA (e.g. by failing to make the agreed upon payments and failing to remit 90% of the sales proceeds to Nanal for sales of its inventory), but continued to sell product bearing Plaintiff's Marks through Leatherup.com. The Court finds that there is sufficient evidence in the record, giving rise to a genuine dispute of material fact, that Defendant has continued to sell products bearing Nanal's marks. Indeed, Defendants as counterclaimants *previously moved for a preliminary injunction* on the basis that Nanal filed several IPR recordings with U.S. Customs and Border Protection to have goods bearing its Marks be detained by Customs. By seeking a preliminary injunction to enjoin Nanal from filing such IPRs, Defendants essentially conceded that they continued to import and sell products bearing Nanal's marks (which they claimed they rightfully purchased) well after Plaintiff sent the October 2019 letter informing Defendants that Nanal would be terminating the license agreement and APA. Moreover, at the December 8, 2021 omnibus hearing, Defendants stated that they have continued to operate the Leatherup.com website "as if [the APA] were still in full force and effect." In light of these admissions, there is at the very least a genuine dispute of material fact as to whether Defendants have caused Plaintiff damage as a result of the ongoing use of Plaintiff's intellectual property, in potential violation of the Lanham Act.

The Court therefore denies Defendants' Motion for Partial Summary Judgment as to

Plaintiff's claims trademark infringement under 15 U.S.C. § 1114(1)(a), and unfair competition under 15 U.S.C. § 1225(a), ECF No. 76.

## IV.    PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### a.  Alleged Facts

The Court finds the following facts to be alleged by Plaintiff in connection with Plaintiff's Motion for Preliminary Injunction.

Defendants and Plaintiff entered into an agreement whereby Defendants would license Plaintiff's valuable intellectual property in exchange for various payments. Defendants later unjustifiably repudiated many of their obligations to pay and refused to cure their breaches of the parties' written agreements, despite Plaintiff's demands that they do so. On October 10, 2019, Plaintiff served written notice on Defendants that (1) the APA and license agreement were terminated; (2) Defendants must cease and desist from further use of Plaintiff's website and trademarks; and (3) Defendants must return the Leatherup.com website to Plaintiff. Defendants ignored Plaintiff's demands, refused to cease their unlawful activities, and caused Plaintiff substantial damage.

To this day, Defendants continue to exploit and conduct their business using Plaintiff's website Leatherup.com, and continue to use Plaintiff's trademarks and trade names. Plaintiff filed IPR notices with the U.S. Customs and Border Protection with respect to three of Plaintiff's marks that Defendants continue to use. On April 19, 2021, the Court denied Defendants' motion for a preliminary injunction to withdraw and enjoin Plaintiff's IPR filings with Customs, finding that "the Defendants cannot establish a likelihood of success" on their claim that Plaintiffs first materially breached the APA. Despite the Court's April 19 Order, Defendants have persisted in using, without Plaintiff's permission and over Plaintiff's repeated objections, Plaintiff's online business and intellectual property.

Plaintiff now requests that this Court issue an Order enjoining Defendants from the continued use of Plaintiff's Marks and Leatherup.com.

### b. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing Winter, 555 U.S. 7, 20 (2008)).

A preliminary injunction may also issue under the "serious questions" test. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the continued viability of this doctrine post-Winter). According to this test, a plaintiff can obtain a preliminary injunction by demonstrating "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," in addition to the other Winter elements. Id. at 1134-35 (citation omitted).

### c. Analysis

The Court finds that Plaintiff cannot establish the second Winter factor – that Plaintiff "will likely suffer irreparable harm in the absence of preliminary relief." Plaintiff argues that Defendants' conduct continues to cause irreparable harm to Plaintiff because Plaintiff has lost control over its business reputation due to Defendants' continued sale of goods under Nanal's trademarks and on Nanal's website. At the December 8, 2021 omnibus hearing, Plaintiff's counsel further argued that "Mr. Bootesaz is prepared to get back into this business" and that Defendants' ongoing control over Plaintiff's intellectual property has frustrated Mr. Bootesaz's ability to reenter the business, resulting in "a loss of money" to Mr. Bootesaz. Defendants contend that Plaintiff has not shown that there is a risk of irreparable harm, because Plaintiff has failed to provide any evidence that it has suffered a loss of goodwill or harm to its business reputation as a result of Defendants' ongoing use of its Marks.

The Court finds that Plaintiff has not shown that it will likely suffer irreparable harm in the absence of relief. To the extent Plaintiff argues that it suffers economic harm as a result of Defendants' alleged breaches, it is well established that mere economic injury does not constitute irreparable harm. Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) ("[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." (citation omitted)). While courts have also recognized that intangible injuries, such as damage to goodwill, may qualify as irreparable harm, the Court agrees with Defendants that Plaintiff has not provided evidence of loss of goodwill or harm to its business reputation in connection with the instant motion. Id. Plaintiff does not provide any evidence – such as evidence of a decline in customers or of customer complaints – that its consumers have in fact reacted poorly to Defendants' sale of product under Nanal's marks, resulting in harm to Nanal's business reputation.

Further, Plaintiff waited over two years from the alleged termination of the APA to seek a preliminary injunction, and has not explained how circumstances have changed such that irreparable harm is now likely, where it previously was not. This lengthy delay weighs against a finding that there is a likelihood of irreparable harm. See Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir. 1985) (stating that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"); see also Edge Games, Inc. v. Elec. Arts, Inc., 745 F. Supp. 2d 1101, 1117-18 (N.D. Cal. 2010) (denying preliminary injunction filed 21 months later and finding the "fact that plaintiff did not timely act . . . is alone sufficient to deny the motion" for a preliminary injunction); Playboy Enters, Inc. v. Netscape Comm'ns Corp., 55 F. Supp. 2d 1070, 1080 (C.D. Cal. 1999) (stating that a five-month delay weighed against a finding of irreparable harm); Valeo Intellectual Property, Inc. v. Data Depth Corp., 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (stating that a "three-month delay in seeking injunctive relief is inconsistent with [plaintiff's] insistence that it faces irreparable harm").

Because Plaintiff fails to demonstrate it will likely suffer irreparable harm in the absence of preliminary relief, the Court need not evaluate the other Winter factors. See Alliance for the

Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (stating that the Winter test requires plaintiff "to make a showing on all four prongs"); Dryden v. Nev., 2:16-cv-01227-JAD-EJY, 2020 U.S. Dist. LEXIS 23831 at *17 (D. Nev. Feb. 10, 2020) (denying preliminary injunction where plaintiff failed to establish a likelihood of irreparable harm and declining to evaluate the other Winter factors). The Court accordingly denies Plaintiff's Motion for Preliminary Injunction, ECF No. 81.

### V.    CONCLUSION

**IT IS ORDERED** that Defendants' Motions for Partial Summary Judgment (ECF Nos. 75, 76) are **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary Injunction (ECF No. 81) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Shorten Time on Setting a Hearing (ECF No. 87) is **DENIED** as moot.

**DATED: December 27, 2021**

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

14