# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

* * *

NANAL, INC.,

    Plaintiff,

v.

SMK INTERNATIONAL, INC., *et al.*,

    Defendants.

Case No. 2:19-cv-02211-RFB-DJA

**BENCH ORDER**

Before the Court is a Bench Order resolving the final claims in this case. This lawsuit arises out of an Asset Purchase Agreement ("APA"), an Intellectual Property License Agreement ("License Agreement"), and a personal Guaranty ("Guaranty"), each dated May 1, 2019, between Plaintiff and Counterdefendant Nanal, Inc. ("Nanal") and Defendants and Counterclaimants SMK International, Inc. ("SMK") and Mohammed Maqbool ("Maqbool").

**I.    PROCEDURAL HISTORY**

On December 23, 2019, Plaintiff Nanal filed their first Complaint against Defendants SMK and Mr. Maqbool. See ECF No. 1. On February 19, Plaintiff filed the operative Amended Complaint. See ECF No. 10. Defendants answered on March 6. See ECF No. 11. On March 27, Defendants filed an Amended Answer. See ECF No. 12. On April 27, Plaintiff filed a Motion to Strike and a Motion to Dismiss the Defendants' Amended Answer. See ECF Nos. 20, 21. On December 28, 2020, Defendants filed an Amended Answer/Counterclaim. See ECF No. 35. On February 2, 2021, Defendants filed a Motion for Preliminary Injunction. See ECF No. 50. During a March 5 hearing, the Court denied Plaintiff's Motion to Dismiss. See ECF No. 71. On March 9, Defendants filed the operative Third Amended Answer/Counterclaim. See ECF No. 69. On April 19, the Court denied the Motion for Preliminary Injunction. See ECF No. 77.

On April 5, Defendants filed two Motions for Partial Summary Judgment. See ECF No. 75, 76. On September 14, Plaintiff filed a Motion for Preliminary Injunction. See ECF No. 81, 82. On December 27, the Court issued an Order denying the Motions for Partial Summary Judgment and the Motion for Preliminary Injunction. See ECF No. 92.

A jury trial was held for six days, from December 16 to December 20, 2024, and on December 23. See ECF Nos. 133, 137, 138, 140, 147, 150. The Parties called the following witnesses: Aaron Golshani, Albert Bootesaz, Joseph Jay Brown, William Shayne, and Mohammed Maqbool. On January 21, Defendants submitted three briefs. See ECF Nos. 143–145. On the same day, Plaintiffs submitted a brief. See ECF No. 146. On December 23, the jury returned a verdict, finding for Nanal on their claims for breach of contract and breach of the implied covenant of good faith and fair dealing. They awarded Nanal damages against SMK in the amount of $700,000 and damages against Mohammed Maqbool in the amount of $500,000. The jury found for SMK on their breach of contract claim for the breach of the License Agreement and awarded them $132,737 in damages against Nanal. On January 28, 2025, the Court held a hearing on the remaining claims and instructed the Parties to file individuals briefs by February 18, 2025. See ECF No. 155. The Parties filed these briefs. See ECF Nos. 163, 164. The conclusion of the bench trial was held on May 27, 2025. See ECF No. 165.

Therefore, by the end of trial, Plaintiff's breach of contract and breach of the implied covenant claims were resolved by the jury. The Court ruled on the trademark infringement claim during trial. Plaintiff withdrew their unfair competition claim. Their declaratory relief claim remains. Similarly, Defendants and counter-claimants' breach of contract and breach of the implied covenant claims were resolved by the jury. Defendants withdrew their conversion claim, intentional inference with business relationships claim, and conversion of purchase price claim. The Court resolved their unjust enrichment claim during trial. Their specific performance claim remains.

Having heard and reviewed the evidence, observed the credibility of the witnesses, and considered the Parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law related to the Parties remaining claims for trademark infringement, unjust

enrichment, declaratory relief, and specific performance, as well as related damages.

## II.     FACTUAL FINDINGS

Certain of Nanal's trademarks are registered with the United States Patent and Trademark Office:

a. Hawk Helmets®, Registration No. 4,196,267, Registered August 28, 2012.
b. Leatherup.com®, Registration No. 3,784,320, Registered May 4, 2011.
c. Leatherup.net®, Registration No. 4,256,713, Registered December 11, 2012.
d. Leatherup.org®, Registration No. 4,256,714, Registered December 11, 2012.
e. Outlaw Helmets®, Registration No. 4,022,714, Registered September 6, 2011.
f. Rebel Advance Motorcycle Gear®, Registration No. 5,288,448, Registered September 19, 2017.
g. Rebel Motorcycle Boots®, Registration No. 5,288,447, Registered September 19, 2017.
h. Vulcan Helmets®, Registration No. 4,064,128, Registered November 29, 2011.
i. Xelement Motorcycle Gear®, Registration No. 3,913,119, Registered February 1, 2011.
j. Nanal's common law trademark, Leatherup.ca.
k. A website and web domain associated with Leatherup.com. Leatherup.com is an online marketplace that offers for sale clothes, helmets, and other gear and products made to meet the needs of owners and riders of motorcycles.
l. Two websites and web domains associated with Leatherup.org, and Leatherup.net.

Under the APA, Nanal agreed to sell the Marks and the Domain Names to SMK and SMK agreed to do the following: Pay to Nanal a Purchase Price of $1,700,000, which included cancellation of $1,000,000 of debt owed by Nanal to SMK and cash payments of $700,000 to Nanal (the "Purchase Price"); make available for sale on Leatherup.com the remaining inventory, if any, of "Nanal's Affiliate"; and provide a credit card to Nanal with a minimum limit of $100,000 for Nanal to charge, on a daily basis, the sales of the affiliate inventory, less a commission to SMK of 10% of SMK's sales revenue from sale of the affiliate inventory. Albert Bootesaz, Nanal's President, signed the APA and License Agreement. Mr. Maqbool owns SMK and signed the APA and the License Agreement. As required by the APA, Maqbool signed a personal Guaranty of all of SMK's obligations to Nanal under the APA, also dated as of May 1, 2019. SMK cancelled the $1,000,000 of debt owed by Nanal to SMK.

Under the License Agreement, Nanal retained ownership of the marks. The License provided SMK an "exclusive, royalty-free, nontransferable, non-sublicenseable license" to use

their marks during the "Term." See Section 1.1. The "term" of the license is defined in Section 8.1 which provides that it will "remain in force until the earlier to occur of (x) the Closing Date (as such term is defined in the Asset Purchase Agreement) and (y) the cancellation or termination of the Asset Purchase Agreement[.]" At the APA's Closing Date, SMK would own the Marks and Domain Names, as long as the APA and License Agreement did not terminate prior to the Closing Date. There is no dispute that the closing date never occurred. Therefore, whether the "term" ended, such that SMK was no longer granted a license to use Nanal's marks turns on whether the APA was cancelled or terminated. The License Agreement provides that it automatically terminates if the APA is terminated.

Section 8.1 of the APA provides that it may be terminated "by Seller by written notice to Buyer if: (i) Seller is not then in material breach of any provision of this Agreement" or "(ii) any of the conditions set forth in Section 6.02 shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing[.]" The Drop Dead Date was June 30, 2019. See Section 8.01(b)(i). The APA provides that the Agreement is governed by California law.

SMK assumed operation of the Leatherup.com website on May 15, 2019. Nanal's inventory continued to be sold on the Leatherup.com website. SMK provided invoices of the generated sales, Mr. Bootesaz would remove 10% from the daily amount of sales and charge the credit card for the remainder that Nanal was due from the sale of the inventory. The credit card was being paid by SMK. On June 3, 2019, SMK froze the Nanal credit card. Mr. Maqbool argued that Mr. Bootesaz was charging duplicate orders and there were issues with the invoicing. Nanal continued to sell the product and generate invoices reflecting the 90% that Nanal was due. Since daily charges on the card were not occurring, Nanal was not being paid for the continued sales of inventory. Nanal continued to sell inventory in June, July, August, and September 2019. At some point, the trademarks for Leatherup.net and Leatherup.org, two websites that redirected traffic to Leatherup.com, expired.

On October 10, 2019, Nanal sent a letter to SMK placing them on formal notice of their

alleged breach of the APA due to SMK's failure to make payments on the inventory. On November 1, 2019, SMK missed one of the $80,000 payments due pursuant to the APA. On November 25, Nanal sent another letter to SMK notifying them that they are "in substantial and material breach of the APA" and "the APA and License Agreement have been terminated due to the failure by SMK and you to pay substantial monies owed to Nanal[.]" They provided one "opportunity to have the APA and License Agreement reinstated, if but only if, within seven (7) days of the date of this letter, Nanal receives all sums owed by SMK and you as set forth below[.]"

On December 1, 2019, SMK missed another of the $80,000 payments due pursuant to the APA. In a December 19, 2019, letter, Nanal told SMK to cease and desist in using their marks. In September and December 2020, Nanal filed Intellectual Property Right ("IPR") notices with United States Customs and Border Patrol ("CPB") with respect to three of the Marks: "Outlaw Helmets," "Hawk Helmets," and "Xelement Motorcycle Gear." In September 2020, SMK paid Nanal $180,000, which included the $160,000 due under the APA along with an additional $20,000.

Aaron Golshani, who worked for both Nanal and then SMK, explained that the following Nanal brands—Hawk Helmets®, Outlaw Helmets®, and Xelement Motorcycle Gear®—accounted for 30-to-40 percent of sales on Leatherup.com. He also indicated that SMK's revenues in 2019 were a little over $8 million. Mr. Maqbool claimed that SMK's gross revenues for 2019 were $3.891 million. For that same year, there was purportedly a tax loss of $90,815. Mr. Golshani also explained that SMK's gross sales from Leatherup.com were around $14 million in 2020. Xelement-branded merchandise amounted to around 20%–25% of those sales. He testified the gross sales from Leatherup.com in 2021 were around $18 million. Both Xelement and Vulcan were sold in 2021. Xelement also similarly amounted to 20%-25% of sales. In 2022, sales were around $12 or $13 million. Mr. Golshani testified that he only recalled Xelement being sold that year. Xelement would have been around 20% of sales. Mr. Golshani was no longer at SMK in 2023. After the Parties' disputes in 2019, SMK continued to use the Xelement mark and Leatherup.com.

///

///

### III. LEGAL FINDINGS

#### A. TRADEMARK INFRINGEMENT AND COUNTERFEITING

"To prevail on its Lanham Act trademark claim, a plaintiff must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1202 (9th Cir. 2012) (quotation marks omitted); see also Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011) (citation and quotation omitted). A plaintiff must also allege and establish that defendant's use of the mark was "without [plaintiff's] consent" (i.e. was unauthorized) and that it was "in commerce" and "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 602 (9th Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a)).

The Plaintiff bears the ultimate burden of showing that the trademark is valid and protectable. See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927–28 (9th Cir. 2005). A plaintiff makes a *prima facie* showing of ownership of a protectable trademark by producing a certificate of registration. See 15 U.S.C. § 1057(b); see also Applied Info. Scis. Corp. v. eBAY, Inc., 511 F.3d 966, 970 (9th Cir. 2007).

The Court finds that Nanal has established registration of its relevant trademarks. Defendants do not contest that the marks are protectable. Therefore, the first element for establishing a trademark claim is not in dispute. Additionally, SMK used the marks in advertising and selling products. Nanal explicitly directed SMK to stop using the marks after payments had not been made. Hence, the continued use of the marks was without Nanal's consent.

The "likelihood of confusion" standard "considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case." Rearden, 683 F.3d at 1209. This is the case even for counterfeiting claims. See Arcona, Inc. v. Farmacy Beauty, LLC, 976 F.3d 1074, 1079 (9th Cir. 2020) ("Section 1114 addresses both trademark infringement and counterfeit claims[.] We thus hold that a counterfeit claim requires a showing of likelihood of confusion under Section 1114."). In a traditional trademark infringement suit, the Court determines the likelihood of

confusion according to the eight factors established in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir.1979). "In a dispute between a licensee and licensor, however, the inquiry is different." Robert Trent Jones II, Inc. v. GFSI, Inc., 537 F.Supp.2d 1061, 1065 (N.D. Cal. 2008). There is no need to compare SMK's marks or products with Nanal's—they are identical by virtue of the License Agreement. See id.; see also Hollywood Athletic Club v. GHAC–CityWalk, 938 F.Supp. 612, 614–15 (C.D.Cal.1996) ("[T]he issue of "likelihood of confusion" is not disputed because GHAC, as a licensee of the Marks, is using the identical Marks."); Paisa, Inc. v. N & G Auto, Inc., 928 F.Supp. 1009, 1013 n.4 (C.D. Cal. 1996) ("In this case, the marks are not merely similar, but identical. Defendant continues to use Paisa's mark without authorization[.]"). "Courts have repeatedly held that the continued use of a trademark or service mark by one whose license to use such has been revoked or canceled, satisfies the likelihood of confusion test." Lerner v. Sackett, No. 2:08-CV-1123-KJD-RJJ, 2009 WL 10693640, at *3 (D. Nev. Sept. 28, 2009); see also Sun Microsystems v. Microsoft Corp., 999 F.Supp. 1301, 1311 (N.D. Cal.1998) ("Where a licensee persists in the unauthorized use of a licensor's trademark, courts have found that the continued use alone establishes a likelihood of consumer confusion.").

Therefore, "[Plaintiff's] claim of trademark infringement is contingent only upon proper termination of the License Agreement." Sleash, LLC v. One Pet Planet, LLC, No. 3:14-CV-00863-ST, 2014 WL 3859975, at *8 (D. Or. Aug. 6, 2014); In re Power Swing Partners, 9 B.R. 512, 519 (Bankr. S.D. Cal. 1980) ("[T]his Court finds that the license agreement was properly terminated as of August 11, 1979, and concludes that as of that date the debtor had no further rights to manufacture and market the Power Swing under the agreement."); Pop-A-Shot Enter. LLC v. EastPoint Sports Ltd., LLC, No. 2:23-CV-08841-HDV-PDX, 2023 WL 8170796, at *3 (C.D. Cal. Nov. 6, 2023), appeal dismissed, No. 23-3690, 2023 WL 11983231 (9th Cir. Dec. 6, 2023) ("It is axiomatic that once a license agreement is terminated, the former licensee cannot continue using the mark. Thus, the central question is whether Plaintiff has made a sufficient showing that it properly terminated the parties' Agreement."). Accordingly, the core of the dispute concerns whether the License Agreement between Nanal and SMK was effectively terminated prior to Nanal's lawsuit alleging trademark infringement due to SMK's continued use of the marks. Unless

SMK is authorized under the License Agreement to use the trademarks, SMK is violating Nanal's rights as the registered owner of the disputed marks. See Wetzel's Pretzels, LLC v. Johnson, 797 F.Supp.2d 1020, 1025 (C.D. Cal. 2011) ("[T]he Court finds that if the termination of the Franchise Agreement was proper, Plaintiff has demonstrated the use of the Wetzel's marks was unauthorized.").

The Court finds that the APA was properly terminated as of October 10, 2019, and concludes that is the date after which SMK had no further right to use the marks. By that date, the credit card was frozen, Nanal had not been paid for the sale of inventory over a series of months, and, after that point, the Parties' disputes escalated to the point that SMK failed to make the remaining payments pursuant to the APA, and Nanal sent a cease-and-desist letter to stop using the trademarks. Yet, SMK continued to use the marks.

The only arguments that SMK can raise to claim that the APA was not terminated, and hence, the License Agreement was still in effect are (1) that Nanal was in material breach itself, or (2) that Nanal did not properly terminate the contract.

The Court finds that Nanal was not in material breach of the APA. California courts allow termination only if the breach can be classified as "material," "substantial," or "total." Superior Motels, Inc. v. Rinn Motor Hotels, Inc., 195 Cal.App.3d 1032, 1051 (Cal. 1st Dist. Ct. App. 1987) (collecting cases). Whether a partial breach of a contract is material depends on "the importance or seriousness thereof and the probability of the injured party getting substantial performance." Brown v. Grimes, 192 Cal.App.4th 265, 277 (Cal. 2d Dist. Ct. App. 2011). SMK argued that Nanal was in material breach (i.) because they misrepresented the "Leatherup.net" and "Leatherup.org" trademarks as protected when they, in fact, expired, and (ii.) due to improper charges related to the credit card. These disputes are not significant enough to be material. To the first breach, the primary component of the agreement was the acquisition of the leatherup.com website, not the other two websites, much less the alleged trademark of those websites. These other websites were not operational websites apart from the main Leatherup website. To the second breach, the alleged discrepancies do not clearly violate the relevant terms of the agreement, certainly not to the degree to materially undermine it. No condition of the APA provided that Nanal had to engage in certain

specified conduct related to the credit card, such as providing certain details in invoices. Moreover, the Court finds that Mr. Bootesaz nevertheless tried to provide the most accurate information he could, but he was also dependent upon SMK for providing accurate information as well. Finally, the jury found that Nanal did not breach the APA.

The Court finds that Nanal properly terminated the contract. Even though Nanal sent a letter in November providing SMK with an opportunity to cure, and even though they accepted some payments after the October 10, letter, this does not "revive" the contract. California law provides, "[o]nce an option to terminate a contract is exercised, the contract is extinguished and discharged; it cannot thereafter be revived" even where the other party offers to perform the act "the nonperformance of which gave rise to the option to terminate." Siegel v. Lewis, 168 F.2d 50, 53 (Cal. 2d Dist. Ct. App. 1946). "A terminated contract cannot be extended or modified; both extension and modification as those terms are commonly understood presuppose the existence of a valid contract[.]" See Citizens for Amending Proposition L v. City of Pomona, 28 Cal.App.5th 1159, 1189 (Cal. 2d. Dist. Ct. App. 2018). Indeed, even the party who terminated the contract cannot undo the termination. Beverly Way Assocs. v. Barham, 226 Cal.App.3d 49 (Cal. 2d Dist. Ct. App. 1990) (holding buyer could not revive contract despite communicating that buyer was "prepared to waive" objections that had already terminated contract). Furthermore, at no time did Nanal indicate that the agreement was not terminated, even in their November letter. See e.g., In re Power Swing Partners, 9 B.R. 512, 519 (Bankr. S.D. Cal. 1980) (citations omitted) ("It is true that Mr. Grunewald negotiated with the debtor during the cure period, but in doing so he cannot be said to have waived his election to terminate.").

Therefore, because Nanal was not in material breach, and a contract, once terminated, cannot be revived, Nanal's October letter properly terminated the contract. The termination of the APA terminated the License Agreement, meaning that SMK was no longer entitled to use Nanal's marks. Since SMK continued to use the marks after the termination of the licensing agreement, Nanal has established that SMK engaged in trademark infringement. See Paisa, Inc., 928 F.Supp. at 1013 ("[T]he undisputed evidence shows that Defendant continues to use the identical registered trademarks that it had previously licensed."); Pogrebnoy v. Russian Newspaper Distrib., Inc., 289

1  F.Supp.3d 1061, 1070 (C.D. Cal. 2017), aff'd, 742 F.App'x 291 (9th Cir. 2018) ("Having already
2  concluded that an implied license allowing Defendants to use the marks existed, Defendants' use
3  of those marks after a valid termination would be infringing.").

Finally, "a counterfeit claim is merely the hard core or first degree of trademark infringement[.]" Arcona, Inc., 976 F.3d at 1079 (internal citation omitted). A counterfeiting claim under "Section 1116(d) requires that the mark in question be (1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark." Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., 658 F.3d 936, 946 (9th Cir.2011); see also Partners for Health & Home, L.P. v. Seung Wee Yang, No. CV 09–07849, 2011 WL 5387075, at *8 (C.D. Cal. Oct. 28, 2011) ("Trademark infringement under 15 U.S.C. § 1114(1) also constitutes trademark counterfeiting when the infringer uses a 'counterfeit mark,' which is defined as 'a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use . . .' 15 U.S.C. § 1116(d)(1)(B)(I)."). Here, Nanal's marks were registered, and SMK's use of those marks was no longer authorized once the APA and License Agreement were terminated. The Court finds that the facts of this case, involving a former licensee's continued use of a mark after they were no longer authorized to do so, constitutes the use of a counterfeit mark. See Idaho Potato Comm'n v. G & T Terminal Packaging, Inc., 425 F.3d 708, 720–22 (9th Cir. 2005) (finding that continued use of a certification mark by a former licensee constitutes counterfeiting); see also Henderson v. Lindland, No. CV 11-01350 DDP DTBX, 2012 WL 1292496, at *2 (C.D. Cal. Apr. 16, 2012).

**B. STATUTORY DAMAGES**

Having determined that Nanal prevails on their trademark infringement claim, the Court must now assess damages. There are two alternative avenues for monetary relief in cases involving the use of a counterfeit mark: actual damages or statutory damages. See K & N Eng'g, Inc. v. Bulat, 510 F.3d 1079, 1082 (9th Cir. 2007); see also State of Idaho Potato Comm'n, 425 F.3d 708, 720 (9th Cir. 2005) ("Section 1117(c) allows a plaintiff to opt for statutory damages in cases involving the use of a counterfeit mark."). The Parties agree that Nanal has elected statutory damages. See

1  Coach, Inc. v. Diva Shoes & Accessories, No. 10-5151 SC, 2011 WL 1483436, at *4 (N.D. Cal.
2  Apr. 19, 2011) ("Coach seeks to recover statutory damages in lieu of actual damages as relief.
3  Accordingly, the Court examines the only one of Coach's claims for which statutory damages are
4  available—its claim for trademark counterfeiting and infringement.").

5        ***i.***     ***Willfulness***

6        The Lanham Act provides that an award of damages should be no less than $1,000 and no
7  more than $200,000 in statutory damages "per type of goods or services sold, offered for sale, or
8  distributed." 15 U.S.C. § 1117(c)(1) (2012). Willful infringements increase the statutory-damages
9  ceiling to $2,000,000. See id. § 1117(c)(2). The Court finds that SMK's conduct was willful. SMK
10  was repeatedly notified that they could not continue to use Nanal's marks. SMK's defense is that
11  they were entitled to continue to use the marks because Nanal's breaches failed to terminate the
12  contract. However, once they felt that Nanal had engaged in misconduct, they could have sued for
13  breach of contract instead of refusing to make payments pursuant to the APA while continuing to
14  use the marks. See e.g., Green River Bottling Co. v. Green River Corp., 997 F.2d 359, 362 (7th
15  Cir. 1993)("[T]he infringement of a trademark is not a proper self-help remedy for a breach of
16  contract."); see also S & R Corp. v. Jiffy Lube Intern., Inc., 968 F.2d 371, 376 (3rd Cir. 1992)
17  ("Under no circumstances may the nonbreaching party stop performance and continue to take
18  advantage of the contract's benefits."); Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co.,
19  576 F.Supp. 1055, 1060 (E.D.N.Y. 1983) ("The continued use by the defendants of a licensed
20  trademark after the Franchise Agreement had been terminated constitutes an additional trademark
21  infringement as well as a breach of contract.").

22        ***ii.***     ***Number of Products and Marks***

23        Statutory damages are "per counterfeit mark per type of goods or services sold, offered for
24  sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c). "[T]he phrase 'per counterfeit
25  mark' does suggest that, as in copyright law, the number of infringing copies is not important; the
26  number of protected marks violated is more important." Chanel, Inc. v. Tshimanga, No. C-07-
27  3592 EMC, 2008 WL 11388119, at *11 (N.D. Cal. July 15, 2008), report and recommendation
28  adopted, No. 07-3592 SC, 2008 WL 11388118 (N.D. Cal. Aug. 1, 2008). There are ten trademarks

in this case: Hawk Helmets®, Leatherup.com®, Leatherup.net, Leatherup.org, Leatherup.ca, Outlaw Helmets®, Rebel Advance Motorcycle Gear®, Rebel Motorcycle Boots®, Vulcan Helmets®, and Xelement Motorcycle Gear®. However, Leatherup.net and Leatherup.ca were not maintained and expired. Therefore, there are only seven marks at issue.

### iii.   Appropriate Amount of Damages

Where "statutory damages are elected, [t]he court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." Peer Int'l Corp. v. Pausa Records, Inc., 909 F.2d 1332, 1336 (9th Cir. 1990) (quotation marks omitted); Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1010 (9th Cir. 1994) (stating that courts have wide discretion in awarding statutory damages under an analogous provision of the Copyright Act). Courts have considered the following factors when deciding how much to award in statutory damages: "(1) the expenses saved and the profits reaped by the defendant; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant." UL LLC v. Space Chariot, Inc., 250 F.Supp.3d 596, 614 (C.D. Cal. 2017) (citations omitted).

Neither party has presented complete records related to the first three factors, including (1) the expenses saved and the profits reaped by SMK; (2) the revenues lost by Nanal; (3) or the value of the marks. Nanal has not presented evidence of lost revenue. After the termination of the APA, Nanal was not engaged in the sale of products bearing the trademarks. Nanal has not presented evidence that some of the products sold by SMK were products Nanal also offered because Nanal was no longer independently selling any products. Neither party has presented persuasive evidence about the market value of the trademarks, separate from the value that SMK would have paid under the APA, which was $1.7 million for all marks. Aaron Golshen testified to Defendants' gross sales, especially those products bearing the Xelement mark, but he did not testify about profits. However, a plaintiff does not need to prove lost revenue and defendant's profits. "It is clear . . . that a plaintiff may recover statutory damages whether or not there is adequate evidence of the actual damages

suffered by the plaintiff or of the profits reaped by defendant." Peer Int'l, 909 F.2d at 1337 (quotation marks omitted). As to factor four, the necessity of deterrence is compelling in this case. The facts of this case are relatively unique compared to the typical trademark infringement case, as SMK was actively contesting whether they still had the right to use the marks. However, SMK was on notice that Nanal considered their actions to be trademark infringement; nonetheless, SMK continued to use the marks for years. Therefore, as described above, SMK's conduct was willful. SMK was repeatedly warned not to continue using the mark. The Court finds, as it relates to the seventh factor concerning discovery, that both Parties are alleged to have engaged in uncooperative conduct. Nanal allegedly failed to identify any documents, fact witnesses, or expert opinions supporting their claim for trademark infringement damages. Defendants only provided 16,000 pages of piecemeal financial records after the conclusion of the jury trial. Overall, the Court lacks a full record regarding the extent to which the respective Parties engaged in discovery related to the trademark infringement claim.

Taking all these factors into account, the Court awards Nanal $1,740,000 in statutory damages, including $1 million for Leatherup.com, $500,000 for the Xelement mark, $50,000 for the Vulcan Helmets, Hawk Helmets, Rebel Advance Motorcycle Gear, and Rebel Motorcycle Boots marks, and $40,000 for the Outlaw Helmets mark. The Court finds that the $3,240,000 requested by Nanal would constitute a windfall considering the lack of lost revenue, the lesser necessity of further deference, and the fact that they received significant benefits from SMK without selling them the marks. See e.g., Adobe Sys., Inc. v. Tilley, No. 09-cv-1085-PJH, 2010 WL 309249, at *6 (N.D. Cal. Jan. 19, 2010) (awarding statutory damages in an amount less than requested to avoid a "windfall"); Yelp Inc. v. Catron, 70 F.Supp.3d 1082, 1102–1103 (N.D. Cal. 2014) (same); Chanel, Inc., No. C-07-3592 EMC, 2008 WL 11388119, at *13 (N.D. Cal. July 15, 2008) ("A larger award is not appropriate given that Chanel has not provided any evidence to show that it has lost revenues as a result of Ms. Tshimanga's conduct and an award of this size will adequately serve to deter Ms. Tshimanga, an individual. On the other hand, a smaller award is not appropriate in light of the value of the CC monogram and Chanel word marks and Ms. Tshimanga's willful infringement.").

## C. Declaratory Relief

A declaration of rights is typically a form of relief rather than an independent cause of action. "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." U.S. v. Wash., 759 F.2d 1353, 1357 (9th Cir. 1985). Here, however, the Parties' breach of contract claim does not resolve all questions regarding the contract. Both Parties contest who owns the marks. Plaintiff seeks a declaration that SMK is not entitled to use the marks. Defendants seek specific performance compelling Plaintiff to sell the marks to them. Considering that the APA was never executed and the License Agreement is terminated, the marks remain under the ownership of Nanal.

## D. Affirmative Defenses and Equitable Relief

Both Nanal and SMK raise numerous equitable defenses that the Court finds do not apply, including waiver, laches, estoppel, and unclean hands. First, Section 9.09 of the Asset Purchasing Agreement includes a no waiver provision. Next, "[f]or laches to apply, a defendant must prove that plaintiff unreasonably delayed in filing suit from the time plaintiff knew or should have known of the infringement and that there was resulting prejudice to the defendant." Lucent Techs. Inc. v. Gateway, Inc., No. 02-cv-2060-B(CAB), 2007 WL 1449804, at *3 (S.D. Cal. May 15, 2007). On October 10, 2019, Nanal declared that SMK was in material breach of the APA and terminated the APA and License Agreement. They filed suit on December 23, 2019. This is not an unreasonable delay. Next, for estoppel to arise, one must knowingly act so as to lead another, without knowledge of the facts, to act on the basis of the conduct to his detriment. See e.g., U.S. v. Ruby Co., 588 F.2d 697, 703 (9th Cir. 1978). Here, evidence from trial does not support the conclusion that either party was acting without knowledge of the facts. As to the termination of the contract, nothing indicates that Nanal intended, or SMK could reasonably have believed, that the agreement would not be terminated if the payments were not paid. SMK was fully aware of the facts, as they received multiple letters and their efforts to sell the intellectual property were thwarted by Nanal's cease and desist letters. Finally, unclean hands is not a defense to Nanal's trademark infringement claim. "To make out an unclean hands defense, a trademark defendant must demonstrate that the

plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims. To show that a trademark plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive consumers." Japan Telecom, Inc. v. Japan Telecom Am., Inc., 287 F.3d 866, 870 (9th Cir. 2002). SMK has presented no evidence showing that Nanal used its trademark to deceive consumers.

Finally, the Court finds that the Parties are not entitled to further equitable remedies. "The necessary prerequisite" for a court to award equitable remedies is "the absence of an adequate remedy at law." Barranco v. 3D Sys. Corp., 952 F.3d 1122, 1129–31 (9th Cir. 2020) (quoting Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962)). Here, the Parties have received adequate legal remedies in the form of money damages from the jury. Furthermore, under California law a claim for unjust enrichment will not lie if there is an express agreement between the Parties which covers the "same subject matter, existing at the same time." Wal-Noon Corp. v. Hill, 45 Cal.App.3d 605, 613–14, 119 Cal. Rptr. 646 (1975). Therefore, the only damages that SMK can receive under a theory of unjust enrichment are any payments they made to Nanal after October 10, 2019, when the contract was terminated. Any payment before that date was governed by the contract and the appropriate remedy is a breach of contract claim. SMK has already brought that claim and received legal remedies for that breach.

Therefore, Nanal has established their trademark infringement claim and are entitled to statutory damages due to SMK's continued use of the counterfeit marks after the October 10, 2019, termination of the contract. SMK is entitled, under a theory of unjust enrichment, to any payments made to Nanal pursuant to the contract after its termination, which includes the $180,000 payment they made in September 2020. Nanal retains ownership of the trademarks.

///
///
///
///
///
///

## IV. CONCLUSION

Therefore, **IT IS HEREBY ORDERED** that Nanal is awarded $1,740,000 in statutory damages against SMK pursuant to their trademark infringement and counterfeiting claim.

**IT IS FURTHER ORDERED** that SMK is awarded $180,000 against Nanal pursuant to their unjust enrichment claim.

**IT IS FURTHER ORDERED** that Nanal retains ownership of the marks.

The Clerk of Court is kindly directed to close the case.


**DATED:** December 29, 2025.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**